Okay, thank you. So the first issue that I want to raise before the court is whether the bankruptcy court should have allowed a bad faith challenge to an allowed homestead. And I believe that there are two Supreme Court cases that bear on this topic. And the first is… The court, counsel, the court did not rule on the homestead exemption. Why are those cases relevant? And the court used the facts and context surrounding the home, the property in evaluating bad faith. Well, actually, what the court did in so far as it dealt with the homestead exemption in its order, essentially, it was tasking the debtor with a full defense of a homestead claim, de novo. But if that is probative of the question of bad faith, what's wrong with that? Well, it's wrong because the homestead was allowed. That's a whole separate issue, though, isn't it? This order does not affect the homestead exemption. Well, it does, because the whole point of the analysis was to disentitle the debtor from the homestead by torpedoing the case, essentially, because of a decision that there would be a collateral attack against the homestead. And that terminated the case, helped to terminate the case. Terminating the case is separate from allowing or disallowing a homestead exemption. Well, I mean, you know, you could say the same thing, I think. I think in law there was the same issue. You know, well, we're not attacking the homestead, you know, guy's homestead. But there are other rules at play, the inherent power of the court that can effectuate a surcharge with a collateral attack. I don't see any difference here that in Taylor, the court said there's got to be finality. And you can't challenge the homestead once it's been allowed. No, you can't challenge the homestead exemption. You can't challenge the exemption. It doesn't mean that, go ahead with your argument. I think I understand what you're saying. I don't mean to interrupt. Okay, well, I appreciate it. But anyway, so Taylor said you fail to object, the consequence is you've got a final determination. And to me, that rings bells of similarity to a judgment. And just as it doesn't make any sense to try to collaterally attack a judgment, to me it doesn't make any sense to have a court hearing. I don't care whether the setting is bad faith on whether the case should be converted, where you're having the debtor again prove up his entitlement to the homestead. So for example, the court order, it's the part that I think is interesting, is recited by appellees on page 25 of their brief. And so in the court's order, the court said, neither Mrs. Wang, that's the appellant, nor one of the tenants, they were witnesses for appellees, could definitively state when Mrs. Wang began sharing the home, how often she was at the property, or how long the rent reduction occurred. And so it's like, judge, why do I have to do anything except say that I have an allowed homestead? Why do I have any burden here? And there's no recognition at all by the court. That wasn't the issue, though. The issue wasn't whether or not there was an allowed homestead. The issue was whether or not the debtor acted in good faith in her conduct in filing the case and in her actions, including whether or not there was unfair manipulation of the bankruptcy code. And that seems to be a separate issue that doesn't really attack the homestead exemption. Well, I respectfully disagree. I mean, I don't see how you can take the judge's wording as anything other than a direct attack on the debtor's claim of homestead exemption. I took it as an attack on the credibility of the debtor. Well, if that's all it was for. Because she couldn't understand. The judge said there was a question of fact of whether or not this debtor lived there, you know, lived there, really. Yeah, but Your Honor, why was it the debtor's burden here? The debtor comes to the hearing with an allowed homestead. The motion, the bad faith motion is made by the creditor. The evidence is in equipoise. The judge doesn't have the right kind of evidence here to establish whether the debtor was or wasn't in the property. Why does the debtor have to prove the case all over again? Why isn't it the creditor's burden to say, well, you know what? We know she wasn't in the house because everybody knows she was sleeping on a park bench in the Patterson Town Square. We got nothing like that. The debtor loses simply because, in my estimation, because, well, her allowed homestead was just, the consequence of the allowed homestead was just utterly disregarded. I just don't, it didn't bear any weight at all is what I'm trying to say. No weight, not one scintilla of weight. Wasn't there additional evidence beyond that, although related? I don't think definitive. I mean, there was a little bit. You're not the judge. That's the problem. You say it's in equipoise, but obviously Judge Hammond didn't find that way. And why is that error? Well, because I think the judge applied the wrong standard. She was taking into account things like, well, we had an investigator go out. There was an investigator that went out six months after the fact, and he didn't see her car there. So what? Counsel, can I ask a question? Yeah. So it's your position then that once the homestead exemption was allowed because no timely objection to allowance the homestead exemption was made, the court was precluded from considering any evidence related to her conduct in terms of the prior transfers of the property, whether or not she was actually living there, anything related to the homestead, that her actions around the homestead were precluded from consideration under your theory once the homestead exemption hadn't been timely objected to. Is that right? As it pertains to the homestead. But no, the transfer is different. The transfer was a separate issue. But the homestead part of it, yes. Well, the transfers could have affected the court's determination as to whether the homestead should have been allowed. But because there wasn't a hearing or determination, it was because there wasn't timely objection made. The homestead was allowed. Your take the position that the court then was precluded from considering evidence about whether she did or didn't live there, whether she did or didn't benefit from the reduction in payments that were made or not made, whether she was lying to the court and concealing the reality of the facts. None of that can be considered if it's related to the homestead. Is that what your argument is? No. Again, I think there's discrete issues. So the fact of the pre-petition transfer, to me, I dealt with it separately. In the brief, I dealt with it separately. I can address that. But I did in the brief. No, it's just literally the homestead, the claim of the homestead. We have two Supreme Court cases that treat this as inviolate. And I just think there was. But the cases that you're referring to actually assess something as against the homestead itself. In this instance, the court, as the two judges have pointed out, did not overrule her request for a homestead exemption. The court used the evidence surrounding her actions to consider whether she was acting in good faith in filing the Chapter 13 and prosecuting. Can't the court use that evidence for that other purpose without violating law versus Segal? I disagree. I'm sorry. I just disagree. I just don't see it. To me, it's just plain. You just can't not. To me, it's the same as making a collateral attack on a judgment. You couldn't do it. Why would you do it here? To me, look, this is the way I see it. We had, if I'm right in my analogy to the allowance as akin to a judgment. So what we had was the judgment. And then a year later, we're having the trial. Does that make sense? Not about the homestead. You're having a trial about whether or not she's acting in good faith in filing and prosecuting a Chapter 13. That brings in all of her conduct and all of the circumstances surrounding the Chapter 13 cases filing and the actions she took during the Chapter 13, not relevant to whether or not she has a valid claim of homestead, but whether she's acting in good faith. Well, OK, I'm sorry. I disagree. But, you know, the Taylor Court did say, you know, there are other remedies. So, you know, you could go to the you could file a criminal complaint. You could. In fact, now there's a rule 4003 something. Could you convert the case? Could you convert the case? Yeah. Could you convert the case as an alternative remedy rather than prosecuting a criminal action against her? Could you convert the case? Yeah, of course. And that's what happened here. That's what happened here. So why isn't that a viable remedy in the sense? Well, it would be if there were, in my mind, legitimate grounds at one of one of which is not attacking an allowed homestead. That's I just see it that way. Let me if I if I may just I guess I have time just for one other point. We're not talking here in connection with the allowed homestead about an overworked trustee. This was a very aggressive creditor, very solid law firm. Miss Beamer is a very, very good, very knowledgeable, albeit aggressive attorney. Hats off to her. She did a wonderful job. But in connection with with the job, how many times do you have two thousand four exams right off the bat, both debtors well in advance of the objection bar date, an objection to confirmation, but no objection to a homestead? That's the that's the only asset of these debtors. The clear, the clear inference you've got to make is that they knew that she was living there and they didn't have grounds to object. And that, too, wasn't taken up by the court. And to me, that's troubling. And that's why. Well, at this point, your honors, I think I'll reserve 250, I think, is what I have left. So I think I'm going to reserve. All right. Thank you. All right, Miss Beamer. Thank you, your honors. I believe that the issue here is that Mr. Zlotoff has misunderstood the appropriate test. The test is, as Judge Gann was asking him about, the totality of the circumstances and the totality of the circumstances includes the requirement that the judge look at everything. This was not an attack, a collateral attack on the homestead. This was a demonstration of, as the court put it in its rulings, one of the worst demonstrations of fraud that she had seen in her time on the bench. And to think that the court would be prohibited or barred from considering the totality of the circumstances, which is the test, which is applied in this case, is simply wrong. Is there an issue that the, you know, affirmative bad acts were the acts of the husband and not Mrs. Wang? You know, is she being, was she being just kind of pulled along on the coattails here because you've got the husband who hid assets, opened secret bank accounts, had secret credit cards in the names of friends? You know, that's, is it, do I look at the whole totality and say, and do I brand her with the same issue? Yes, and let me explain why. If the only acts were the acts of Jack, I think that would be a different situation than we have here today. But that are, those are not the only acts. In fact, let's talk about the secret bank accounts. One of the secret bank accounts was the best friend, Mr. Humphrey Shen, what Mr., what Jack called his man account with his best friend, Jack Humphrey. And Miss, Miss Alice Chang said in her deposition or declaration in the record 1527 that she was aware of the Humphrey Shen account. She knew about it. She signed the petition knowing about the Shen account without correcting the petition or put an account in. She tries to excuse that behavior by stating that she didn't understand the extent to which the Shen account was used. But that's immaterial that she didn't understand the sheer amount of money flowing through the account. It's the fact that she knew about a hidden account and she signed the petition under penalty of perjury and she doesn't say anything or correct that error. She bought into the fraud. She bought into the fraud of the bank accounts. But that's not the only bad act. Alice also was the person who the Patterson property was in the NEMA. And she goes ahead and commits violations of the Uniform Voluntary Transfer Act. She transfers it to her daughter in order to avoid our clients being able to put a judicial name against it. She transfers it back so that she can file bankruptcy without that fraud hanging over the cloud or clouding the bankruptcy issues. She was so that transfers, pre-petition transfers, which under the Cook case can be considered, contrary to what Mr. Zlotoff argues in his brief, are clearly Alice's activity. They're not just Jack's activity. This is not a debtor who is yoked through marriage and has no idea what's going on. Not at all. This is a debtor. Counsel, was there also evidence that Mrs. Wang, if I've got her name right, I apologize if it's Mrs. Chang, that she also lived part-time with her husband as well as separately, that she was not completely unknowledgeable about his activities and his operations based upon their relationship? They weren't completely separated and living apart the entire time? That's correct, Your Honor. There was evidence, and I don't mean to be disrespectful of the parties in this case. We have taken to referring to them as Alice and Jack, which is what they call themselves, because frankly, it's just really confusing when you do the last things, to be honest. So I'm not trying to be disrespectful at all. So Alice, there is evidence in the record, in her deposition, and in her declarations that she lived in the San Jose Bay area. I believe it was an apartment in Mountain View that Jack lived in. And she lived there in order to take care of her, to be available to take care of her grandchildren. And in fact, let's see if I can, I've got this. I believe I have the record things. It'll just, I'll make myself a note to add that in a second to give it to you. But I assure you, sir, that there was express statements that she lived both in Mountain View with Jack, sometimes at her daughter Carol's house, if she needed to stay overnight to take care of the children, the grandchildren. Sometimes she stayed down at the apartment in Mountain View, which was paid for by the Mark Hidden account. And then there are those couple of days, he stayed in the house with the renters. And that is the record. That is what it says. I do not believe I'm overstating at all. I apologize that I don't have it right to hand what's in the record. But it is very definitely both in her declaration that she says that and in her deposition that she says that. If that answers your question, sir. It does. It does. Okay, great. In addition to the question of her signing the petition, knowing that she's going to be held responsible, says right there in the petition that she is jointly signing, she's jointly responsible. She knows about the Shen Bank account. She participates in the fraud by transferring the property back to her daughter and back again. She is benefiting from Jack's hiding of income through his business that he identifies as worth zero dollars and tells people isn't operating and yet is operating through the Margaret account. And he's using the Humphrey Bank account and the Humphrey credit cards in order to do all this work. She benefited from that because if you look at the plan objections, we objected to the plan in this case because we didn't see how they were going to make the payments. In fact, it was a great mystery to us how on earth they were making the payments during the life of the Chapter 13 because she had very little income from her retirement as a manager for many years of the extract. And so how she was making these payments, how the debtors with an income of zero from the business that's allegedly making zero and doesn't exist for Jack, plus them just living on her retirement, which was below the amount they needed to pay, even for the Patterson property mortgage, much less the properties in Arizona and the cars and all the rest of it. And it turns out, well, it's because they weren't living on what they said in the petition. Not at all. They weren't even close. They were living on all the money that was floating through the Margaret Chan and Humphrey account that they didn't bother to tell the court about. And this isn't, oh my gosh, we didn't know we were supposed to tell people about this. You know, Jack went to Margaret Chan and said, I need this because otherwise I won't be able to put food on my table because I have to file bankruptcy because I have legal troubles. When they go in and she fake moves into the Patterson house, Daniel, the son, tells the tenants, Ricky Short and his wife, Maria Ruiz, that my parents are having legal problems. My mom needs to come stay in the house for a little bit in order to avoid the legal problem. This is an intentional pattern of trying to avoid what is happening with a bankruptcy. It is as wrong as it gets. And it's offensive and horrific to the system, to be honest with you. I mean, I just, it's wrong. And trying to conflate the concept that this is an attack on the homestead, picking out, oh, this is just a collateral attack on the homestead, is an intentional misinterpretation of what's going on. This isn't a collateral attack on the homestead at all. This is a court looking at all the circumstances. And in fact, we can tell that this wasn't a collateral attack on the homestead. And the way we can tell is we had, after the case was converted, the entire set of hearings on the homestead exemption. If this is a collateral attack, what happened? So, counsel, just to make sure I appreciate the testimony or the evidence you just suggested, it's to show that, apart from the home, she benefited from, should have been aware of, the income that was being generated from these other sources that weren't being reported, and could, must have known, so to speak, that there was something that was fraudulent afoot since what she was reporting wasn't consistent with how she was living. Is that what you're trying to get us to understand? Absolutely. Both that and the fact that if you look at ER 1527 at lines 13 through 16, she expressly states that she was aware of the Humphrey-Shen account before the filing. She wasn't aware of the amount of money usage, but she knew about it, and she did not fix the petition. She never did anything to fix the situation, all the way through the time the court made the determination to convert the case. That is absolutely correct, Your Honors. And I would also like to just, you know, I only have a few minutes, so I'm going to stay within my time. I would also like to point out the issue about the evidentiary hearing. The standard for the court for the evidentiary hearing is that the, let me make sure I have it here, the requirement is just that the debtor be given a meaningful, a right to have meaningful discussion about it. It's not a requirement that there be an evidentiary hearing. In this particular case, the debtor was given more than a single meaningful hearing. He was given multiple hearings. There was an opportunity to ask for an evidentiary hearing. Mr. Zlatov didn't. He did not ask for an evidentiary hearing in this case. Until after the record was closed. Right, and if that was such a big deal, if it was so important and so critical that he believed that there had to be the contest, the airing of this disputed evidence, that is why you have an evidentiary hearing and what the standard says must be there, then he should have asked for it, and he didn't. And, you know, the reality is there wasn't a lot of dispute here about what the testimony was. There are independent third party, the private investigator. There's independent third parties, Mr. Short and Ms. Ruiz who lived in the house. There's independent testimony by Mr. Shen about the account. There's independent testimony by Ms. Chan, with Margaret Chan, the third party lady, about her account. There's not a lot of disputed evidence here that required an evidentiary hearing. And, obviously, if Judge Hammond felt that there was going to be a need for an evidentiary hearing, she would have asked for one. She felt the need for some additional briefing. She asked for that. Even at that time, Mr. Zlotnick didn't ask for an evidentiary hearing. So, to come up in front of the Court of Appeal and say, oh, this needs to be overturned because there wasn't an evidentiary hearing, lies in the face of both the standards that require an evidentiary hearing and is inappropriate. It's just not error. You didn't ask, you don't get. I think that the key here is this is the standard is that there must be abuse of discretion. And that falls down into a two-part test. Did the court apply the wrong law? We all agree. Mr. Zlotnick agrees. I agree. The correct law was applied. So, then we must show, by looking at the totality of the circumstances, whether there was an abuse of discretion. And that means there had to be no reasonable inferences and no evidence demonstrating fraud. And I think there clearly is. Mr. Zlotnick may not like the evidence, but it's in. And the court listened to it. And the court got to make its decision. And it did. The Tampa finding was appropriate. This is not a question about the Homestead exemption. That was appropriately good. It is, as Judge Fraker was asking in the beginning, this is a discussion about what happened when the Homestead was claimed, about the facts surrounding the claiming of the Homestead. It's not about some collateral attack on the Homestead exemption. Thank you very much, Your Honors. Thank you. All right, Mr. Zlotnick, I think you've got about two and a half minutes, 246. All right, thank you. So I'm going to have to respectfully take issue with some of the statements made by Ms. Deamer. Number one, I don't think there's any evidence in the record. And certainly I don't recall any in the briefs that, I'm going to call her Alice, that Alice lived with Jack at or about the time of the filing. There is no evidence that she knew about the Margaret Chan bank account that was being used by Jack secretly at the time of the filing. There's no evidence contradicting the fact that Alice and Jack were separated at the time of the filing. I don't remember reading it in the brief of Ms. Deamer either. And just to make sure there's a context here, the Humphrey Shen bank account was trivial. And I did amend. I'm sorry, it's not part of the record. I didn't know it was an issue. But I believe there was all of about $500 in the account or something like that. There was an amendment, as I recall. The issue with Chen was not at the beginning of the case. It was into the case when Jack had arranged to use his credit card. It wasn't about a bank account. And the Margaret Chan account, there's no evidence that Alice knew about that. She was living in penury. She was living on Social Security. She was getting assistance as needed from her daughter. And to say that she was living high on the hog and should have known, where's the proof? There is no proof. Her bank accounts showed hardly anything except infusions from either Social Security or from the daughter. You know, I mean, as to the transfer to the daughter, I agree with Judge Montali and his Lara case decision. A good test as to whether there's bad faith, as to whether it would measure up in a 727 action. And an undone transfer just doesn't measure up. I don't see why it would amount to bad faith. Now, on the other hand, if the transfer had not been undone, I think that would be a great example to show a bad faith filing. If someone purposely did a fraudulent transfer and then expected to gain from it by filing a bankruptcy. That's not what we have here, Your Honor. She undid it in order to gain from it from a bankruptcy, right? Because she only undid it because she was caught. I don't know that to be true, Your Honor. But even assuming it's true, again, we know from the Adeeb case, you know, no harm, no foul. Thank you. All right. All right. Thank you both for your good arguments. Thank you very much. This matter will be submitted. Thank you. Thank you.
judges: Brand, Spraker, Gan